68 N.J. Super. 435 (1961)
172 A.2d 691
LUTHER LaRUE, (AND 10 OTHERS), ETC., PLAINTIFFS-APPELLANTS,
v.
TOWNSHIP OF EAST BRUNSWICK, ETC., ET AL., DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued April 24, 1961.
Decided June 29, 1961.
*438 Before Judges CONFORD, FREUND and KILKENNY.
Mr. John Anthony Lombardi argued the cause for plaintiffs-appellants.
Mr. Baruch S. Seidman argued the cause for defendants-respondents.
The opinion of the court was delivered by FREUND, J.A.D.
This in lieu proceeding was instituted by resident taxpayers of the defendant township, contesting the validity of an amendatory zoning ordinance adopted on January 12, 1960, effective two days later. The major thrust of the amendment was to permit, subject to Board of Adjustment approval, the erection of multiple dwelling units or garden apartment developments in five of the township's eleven zoning districts; the ordinance also operated to rezone certain portions of highway property bordering Route 18 in the township.
In their complaint, plaintiffs challenged both the multiple dwelling and rezoning provisions of the amendment as arbitrary, unreasonable and not in accordance with a comprehensive plan. In addition, it was charged that the powers *439 delegated to the Board of Adjustment by the ordinance were ultra vires the authority of the Board. Plaintiffs also claimed that the ordinance was illegal and void in that it was adopted without duly published notice of the meeting for final passage, as required by law. The township building inspector was made a party defendant for the purpose of enjoining him from issuing any permits for the construction or erection of multiple dwelling units.
The trial judge held that the amendatory ordinance constituted in all respects a proper exercise of the municipal legislative power and he thereupon entered judgment for the defendants, from which plaintiffs here appeal.
Proper consideration of plaintiffs' appellate contentions necessitates a somewhat extended factual exposition of the events leading up to the amendment, for their assaults are focused as substantially upon the manner in which the legislation was enacted as upon its alleged deficiencies as written. As gathered from the affidavit of Mayor Louis F. May, Jr., the first zoning ordinance was adopted in the township in 1941, permitting "apartment houses" without either restriction or specified regulation. By amendatory ordinance in 1952, provision was made for multiple dwelling units on the condition that such projects meet certain enumerated standards. In 1956, a contract was entered into between the township and the State Bureau of Planning, for the initiation of detailed and comprehensive studies leading to the overhauling and modernizing of the zoning ordinance. After completion of the preliminary studies, and after numerous discussions and consultations involving the State Planning Board, the Township Planning Board, the Township Committee, and the Board of Adjustment, a comprehensive amendatory zoning ordinance was enacted on November 25, 1958.
The ordinance established eleven districts in the township, running the gamut from Single Family Rural Residence (R-1) to Heavy Industry (M-3). Framed in terms of permitted uses (all those not specifically sanctioned being *440 prohibited), it made no provision for multiple dwelling units. There is some dispute in the testimony as to whether the omission represented a deliberate policy determination on the part of the legislators and administrators or merely a decision to hold the issue in abeyance pending further study. (The question is significant only with respect to plaintiffs' claim of undue influence, to be discussed hereinafter.) Jess Gaynor, a member of the Board of Adjustment, testified that those discussing the matter "generally agreed * * * that we didn't specifically want multiple dwellings * * * [because] we felt that they were of no particular advantage at that time, because of the effect they would have on the school system, the tax setup, the fact that we did not have enough industry * * * to carry the garden apartments." On the other hand, the affidavit of Mayor May, the testimony of Raymond A. Woods, secretary of the Planning Board, and the minutes of the Planning Board meeting of October 16, 1958 support the position that the matter of garden apartments was purposely set aside for further study and was therefore omitted from the 1958 amendment in order that the general overhauling of the township's zoning laws not be delayed by this single aspect.
The inference to be drawn from the sum of the testimony is that the initial decision to omit mention of multiple dwelling units soon produced fears that the absence of express prohibition might lead to the commencement of such developments in any zone of the township. It was therefore decided that preparations should immediately be made for explicitly limiting or restricting such units. Minutes of the Planning Board meetings, admitted into evidence, as well as the testimony of various Township Committeemen and Planning Board members, confirm the conclusion that the question of garden apartments was an alive and recurring issue in the township throughout 1959. The subject was discussed at the regular Planning Board meeting of May 5, 1959; among the considerations mentioned were the percentage of land to be occupied by the developments, the *441 ratio of three, four and five room apartments, provision for off-street parking, landscaping of apartment projects, and the height of any proposed structures. On June 11, 1959 certain proposed zoning amendments, relating not only to multiple dwelling units but also to the zoning of certain highway property, and to minimum floor area, yard and lot area requirements in the various zones, were received by the Board from the Township Committee.
During June and July, the Committee's proposals were discussed in executive or "workshop" sessions by the Planning Board. Consideration of the proposals continued at the regular Planning Board meeting of August 18, 1959. At the regular Planning Board meeting of September 15, 1959, Q. Marshall Sachs, president of Rasac Holding Corp., a developer, appeared, spoke on the proposed amendments, and detailed the advantages to the community of garden apartments. The question of multiple dwelling units was again a subject of discussion at the Planning Board meetings of October 6, 1959 and October 14, 1959. On October 22, 1959 a revised draft of the ordinance was sent to the Township Committee on behalf of the Planning Board. The draft contained substantially the provisions that were later enacted, although, with respect to multiple dwellings, it provided for a maximum unit-per-acre density of twelve. The Committee received the recommendations of the Planning Board at its October 27 meeting, and at its next gathering, on November 10, decided to change the unit-per-acre maximum to fifteen.
On November 24, 1959 the amendatory ordinance was adopted by the Committee on first reading and was published according to law; the published notice established December 8, 1959 as the date for further public hearing on the ordinance prior to final passage. Since a large number of objectors, estimated at about 100, appeared at the December 8 meeting, and since the proposed amendment had provoked widespread controversy in the township, the Committee, on its own motion at the December 8 gathering, *442 adjourned discussion of the amendment to January 12, 1960 in order to allow further preliminary deliberation. On the latter date, after full and heated public discussion, the amendatory ordinance was adopted by a vote of four to one.
Plaintiffs' contentions on this appeal may be summarized as follows: (1) the amendatory ordinance is void because its passage was procured through undue influence of the governing officials, and the necessary votes were thus permeated with self-interest on the part of the latter; (2) the ordinance is void because proper public notice of the January 12 meeting was not given pursuant to the requirements of N.J.S.A. 40:49-2(b) and R.S. 40:55-34, thus depriving many members of the public of an opportunity to be heard; (3) the ordinance as enacted permits multiple dwelling units in all of the township's districts with the exception of the C-4 Commercial district, and, as such, it violates the statutory and constitutional requirements of zoning by districts; (4) the Board of Adjustment cannot legally be vested with the authority to approve or disapprove proposed multiple dwelling installations  and the ordinance is for this reason void as an unlawful delegation of legislative power; and (5) certain zone changes along Route 18 were not in accordance with any comprehensive plan and were enacted without any legislative awareness of the exact nature and location of the area rezoned.

I.
Plaintiffs have endeavored to spin, circumstantially, an elaborate web of political intrigue to support their assertion that the amendatory ordinance was enacted as a result of undue influence exercised upon members of the governing body and the Planning Board (the township officialdom). The center of the web is a dinner, held at a local restaurant in mid-August of 1959, to which were invited members of the Township Committee, the Planning Board and the Board of Education. (A majority, but not all of these members, *443 attended.) The invitation was extended by Morris Spritzer, Esq., on behalf of his client, the aforementioned Rasac Holding Corp., which paid for the dinner. The corporation had been formed on July 30, 1959, had acquired 27 acres of land in the township in early August of 1959, and was quite obviously interested in the development of apartment units.
Spritzer testified that the purpose of the dinner meeting was to discuss the proposed amendment relative to multiple dwelling units and to present to the Township officials the builder's views on the subject. Spritzer recalled that he had advised those present of his client's interest in development of its tract at the rate of 15 units per acre, and that he had sought to apprise them of the type of ordinance that would be economically feasible to a builder. He explained that he had called the dinner meeting, rather than attending regular public meetings of these bodies, because
"it was a matter of my personal judgment that it would be better to have all three boards present at one time, rather than to go back and forth between three boards different evenings. It was to be a sensible discussion of the pros and cons of the amendment, and in my opinion, a matter of personal judgment, I thought it would be better if I could have everybody in the room, out in the open, all at one time, so that they could hear each other's views."
Subsequent to the dinner, Spritzer did attend a regular Planning Board meeting, at which he repeated his attempt to convey the message that "an ordinance that wasn't economically feasible to a builder was a mere sham, and that if a builder couldn't get an economic return from the type of construction he was going to put on the building, they might as well bar garden apartments forever."
Plaintiffs spell out undue influence from the circumstances of this "gratuity" (the dinner meeting), the fact that the ordinance contained the exact units-per-acre maximum suggested on behalf of Rasac, the lack of comprehension of the Committeemen, when questioned at trial, as to the contents of the legislation, a building permit application *444 by Rasac only six days after the effective date of the amendment, and the probability that Rasac would be the major beneficiary of the amendment due to a provision therein that the number of multiple dwelling units in the township could not exceed 10% of the total single family residences. Additionally, emphasis is placed upon a "Garden Apartment Survey," containing conclusions favorable to the erection of such units, allegedly produced by Mayor May and circulated among members of the Township Committee and Planning Board; though there is no disclosure in the record as to who prepared this survey, plaintiffs infer from the Mayor's testimonial silence an admission that Rasac was the silent party.
Plaintiffs urge that the above circumstances warrant a finding of that degree of misconduct or even appearance of misconduct to justify voiding the enactment. They construe our cases as holding municipal officials to an impeccable standard of honesty and aloofness from influence, and claim that that standard was not here met.
It is significant, in our view, that plaintiffs have skirted (for lack of evidence, the record would indicate) an outright assertion of corruption, grounded either in bribery or in direct self-interest. Their closest approximation is the contention that "the self-interest of the donor permeated each donee," an apparent intimation that Rasac's sponsorship of the dinner obligated the township officials, in return, to espouse the legislation requested.
Our determination of this issue must be prefaced by a statement of complete condemnation of the officials' conduct in accepting the business-oriented dinner gift of one with whom their public duties brought them into official contact. The social role of the public servant is necessarily circumscribed by the power and influence of his position; this is a sacrifice he must be taken to have incurred voluntarily. Natural public suspicion of official wrongdoing, born of the rightful publicity showered upon those who occasionally deviate from their oath of office, demands that the legislator *445 and administrator, as the judge, take all essential steps not only to maintain his conduct free of impropriety, but also to avoid scrupulously even the appearance of impropriety. See Canons of Judicial Ethics, Canons, 4, 13, 32. There is no question that the action of the township officials in attending the dinner sponsored by Rasac was, at the very least, a display of extremely poor judgment.
Was it more, though? Does it, in the light of the other circumstances outlined by plaintiffs, provoke such a degree of well-grounded suspicion of fraud or self-interest on the part of the Township Committee and Planning Board members as to vitiate their subsequent action with respect to the amendatory ordinance? We think not. With respect to the charge of undue influence, our examination of the record suggests concurrence with the trial judge's observations that no such showing was made, notwithstanding
"[e]very opportunity was afforded the plaintiffs to present testimony, either by way of suggestion, or in substantiation of the contention that the ultimate product, namely, the amendment to the zoning ordinance, was due to undue influence, fraud or corruption."
Absent a showing of fraud, personal interest, or corruption, an authorized legislative enactment by a properly empowered municipal body is not subject to attack merely on the ground that the motives of the members of the governing body were questionable. Kirzenbaum v. Paulus, 57 N.J. Super. 80, 84 (App. Div. 1959); see Annot., 71 A.L.R.2d 568 (1960). Plaintiffs appear to question little more than the motives of the township officials, in the light of their acknowledged presence at the dinner. By innuendo, we suppose, the thought of possible corruption is circulated, but we find no corroborative evidence in the record. But the presence of a substantial majority of the officials at the dinner, the lack of secrecy surrounding preparations for the dinner, the presence of the press at the gathering (as found by the trial judge, based on a strong intimation in the record)  all tend to negate the inference that the meeting *446 resulted in fact in anything more than a frank (if somewhat one-sided) discussion of the local zoning provisions from a developer's point of view.
Plaintiffs' contention that the ordinance enacted closely resembles that recommended by the builder, thus demonstrating the positive effects of the "gratuity," is not, in the light of the factual foundation laid in the record, supported in logic. The amendatory ordinance contained comprehensive and exacting standards which would have to be met before the Board of Adjustment could approve a developer's application for multiple dwelling units. The unit-per-acre maximum of fifteen, matching that recommended by Spritzer at the dinner, is not equivalent to a demonstration of influence on Rasac's part sufficient to deprive the officials of independent judgment in their formulation of the ordinance; it should be noted that the application filed by Rasac after adoption of the ordinance specified 342 units for the 27-acre site, or slightly less than 13 units per acre. The additional factor that Rasac was the initial applicant under the amended ordinance and might, if its application were to be approved, become the sole multiple dwelling unit developer in the township, indicates neither the unreasonableness of the legislation nor undue influence on the part of the developer. As stated in Kozesnick v. Montgomery Twp., 24 N.J. 154, 173 (1957), "if the intention is to further the welfare of the entire municipality as part of a comprehensive plan * * * it is of no moment that private interests are simultaneously benefited."
The allegation of self-interest is equally without merit. We of course recognize that municipal officials are fiduciaries and trustees of the public interest, and that they must demonstrate, not only in fact but also in deed, an exclusive loyalty to the community they serve and a judgment in municipal matters which is unfettered by anything which might redound to their interest as individuals. Driscoll v. Burlington-Bristol Bridge Co., 10 N.J. Super. 545, 567 (Ch. Div. 1950), modified 8 N.J. 433, 474-75 (1952); *447 Pressey v. Hillsborough Tp., 37 N.J. Super. 486, 491-92 (App. Div. 1955), certification denied 20 N.J. 303 (1956). And it is true that a finding of self-interest sufficient to set aside municipal action need not be based upon actual proof of dishonesty but may be warranted whenever "the public official, by reason of a personal interest in the matter, is placed in a situation of temptation to serve his own purposes, to the prejudice of those for whom the law authorizes him to act." S. & L. Associates, Inc. v. Washington Twp., 61 N.J. Super. 312, 329 (App. Div. 1960), certification granted 33 N.J. 331 (1960). On the other hand, whether a particular interest justifies disqualification is necessarily a factual question, for not every interest, no matter how remote and infinitesimal, may be said to possess the likely capacity to tempt the public official to depart from his sworn duty. As emphasized by the Supreme Court in Van Itallie v. Franklin Lakes, 28 N.J. 258, 269 (1958):
"Local governments would be seriously handicapped if every possible interest, no matter how remote and speculative, would serve as a disqualification of an official. If this were so, it would discourage capable men and women from holding public office. Of course, courts should scrutinize the circumstances with great care and should condemn anything which indicates the likelihood of corruption or favoritism. But in doing so they must also be mindful that to abrogate a municipal action at the suggestion that some remote and nebulous interest is present, would be to unjustifiably deprive a municipality in many important instances of the services of its duly elected or appointed officials. The determinations of municipal officials should not be approached with a general feeling of suspicion, for as Justice Holmes has said, `Universal distrust creates universal incompetency.'"
The alleged interests of the officials herein, as indicated by the proofs, are extremely nebulous and highly speculative. They would appear to ensue solely from the dinner, and to demand an inference on our part that because of the meal lavished upon them by an obviously prejudiced party, Rasac, the Committeemen and Planning Board members were no longer equipped to act primarily in the public interest. *448 Since we have already resolved the issue of undue influence against plaintiffs, the notion that the officials were somehow relieved of their independent judgment must fall of its own weight. There cannot be a conflict of interest where there do not exist, realistically, contradictory desires tugging the official in opposite directions.
This is not a case in which the temptation to act in prejudiced fashion is so strong that, even in the absence of proof of actual prejudice, the legislative action will be set aside as a matter of principle. There is no evidence here of any familial, employment, or personal financial connection, direct or indirect, on the part of any of the officials with either Rasac or its officers. Compare Ames v. Montclair, 97 N.J. Eq. 60 (Ch. 1925) (sale of board of education land to son of one of board members held unenforceable in equity); Rankin v. Board of Education of Egg Harbor Twp., 135 N.J.L. 299 (E. & A. 1947) (award of pupil transportation contract to sister-in-law of chairman of transportation committee of board of education set aside); Pyatt v. Mayor and Council of Dunellen, 9 N.J. 548 (1952) (zoning ordinances set aside where deciding council votes were cast by employees of company principally benefited by the enactments); Zell v. Borough of Roseland, 42 N.J. Super. 75 (App. Div. 1956) (zoning amendment held void under N.J.S.A. 40:55-1.4 where a prime purpose thereof was to enable a church to sell property in rezoned area and a member of the planning board voting for the change was also a member of the church); Aldom v. Borough of Roseland, 42 N.J. Super. 495 (App. Div. 1956) (zoning ordinance held voidable due to participation in its passage by councilman whose employer stood to benefit therefrom); Griggs v. Princeton Borough, 33 N.J. 207 (1960) (borough council's designation of area owned in large part by Princeton University [as principal stock and bondholder of municipal improvement corporation] as "blighted area" held invalid where two of the voting councilmen were professors at the University); McNamara v. Saddle River Borough, *449 64 N.J. Super. 426 (App. Div. 1960) (zoning amendment designed to regulate restrictively or perhaps even prohibitively particular property for use as a day school held invalid where dependent on vote of councilman who owned property within 200 feet of zoned site and who had been engaged in prior litigational efforts to prevent establishment of the school).
These holdings merely reflect a judicial understanding of human nature: faced with the opportunity to further his own interests, or with a sharply drawn conflict between his own interests and the public welfare, an individual may, if continually tempted, at some point be swayed, to the detriment of the public. No comparable temptation exists herein. The factor of the dinner alone, while an unfortunate incident, is simply too remote in and of itself to justify vitiation of the ordinance.

II.
Following its first reading, pursuant to statute, notice of the proposed date of final passage of the ordinance was given the advance publication required by N.J.S.A. 40:49-2 and R.S. 40:55-34 in order to allow organized public discussion thereof. The meeting was advertised for December 8, 1959, and about 100 townspeople attended at that time. Early in the meeting, the Committee by formal motion adjourned consideration of the ordinance to January 12, 1960 in order to extend the time for public deliberation. Concededly, no further legal publication of notice of the January 12 meeting was effected. Plaintiffs claim that the failure to republish the notice, following postponement of discussion at the December 8 meeting, violated the statutory directive, deprived many citizens of the chance to be heard, and rendered the ordinance invalid.
N.J.S.A. 40:49-2 provides in pertinent part as follows:
"Except as otherwise provided in sections 40:49-6 and 40:49-12 of this Title, the procedure for the passage of ordinances shall be as follows:
*450 a. Every ordinance after being introduced and having passed a first reading, which first reading may be by title, shall be published at least once in a newspaper published and circulated in the municipality, if there be 1, and if not, in a newspaper printed in the county and circulating in the municipality, together with a notice of the introduction thereof and the time and place when and where it will be further considered for final passage. If there be only 1 such publication the same shall be at least 1 week prior to the time fixed for further consideration for final passage. If there be more than 1 publication, the first shall be at least 1 week prior to the time fixed for further consideration for final passage.
b. At the time and place so stated in such publication, or at any time and place to which the meeting for the further consideration of the ordinance shall from time to time be adjourned, all persons interested shall be given an opportunity to be heard concerning the ordinance. Final passage thereof shall be at least 10 days after the first reading.
c. Upon the opening of the hearing, the ordinance shall be given a second reading, which reading shall be in full, and thereafter, it may be passed with or without amendments, or rejected. If any amendment be adopted, substantially altering the substance of the ordinance, the ordinance as so amended shall not be finally adopted until at least 1 week thereafter, and the ordinance as amended shall be read at a meeting of the governing body, which reading may be by title, and shall be published, together with a notice of the introduction, and the time and place when and where the amended ordinance will be further considered for final passage, at least 2 days prior to the time so fixed. At the time and place so fixed, or at any other meeting to which the further consideration of the amended ordinance may be adjourned, the governing body may proceed to pass the ordinance, as amended, or again amend it in the same manner * * *"
This statute must be read in pari materia with R.S. 40:55-34, applicable solely to zoning legislation and extending the advance publication date to a minimum of 10 days prior to public hearing. Insofar as they are not altered by the latter provision, the general mechanics of enactment, as outlined in N.J.S.A. 40:49-2, remain applicable. See Stirling v. City of Plainfield, 136 N.J.L. 38 (E. & A. 1947).
The crux of plaintiffs' argument is that the statutes require written publication of any initial meeting relative to final passage of an ordinance, and, if that initial meeting *451 is never commenced but is postponed, as here, in its entirety, the township must commence all over again legal publication of the new meeting date. Plaintiffs construe the reference in N.J.S.A. 40:49-2 to "further consideration of the ordinance" as applying only when substantive deliberation is actually begun at the initial meeting and, for lack of time or otherwise, continued to subsequent gatherings. According to plaintiffs, the township had only two possible legal courses of action on December 8, 1959  either to hold a public hearing, pursuant to the notice given, and, if necessary, continue it to some other date, or to cancel the hearing and republish notice of a new hearing date.
A careful reading of the statute, against the background of its clear purpose, demonstrates the weakness in plaintiffs' contention. The obvious design of the legislation is to insure that the public will be apprised of the proposed ordinance (or amendment) prior to its final passage in order that objections may be fully and freely raised and, if persuasive, honored. It was contemplated that those sufficiently interested would attend the initial public hearing, would express their views, and, if discussion were not completed and the hearing had to be continued to a later date, they would at that point be adequately informed of the time at which their presence and their views, if any, would be entertained. Both common sense and the express language of the statute bolster such a construction.
Those in attendance at the hearing initially scheduled for December 8, 1959 were there informed both of the fact of postponement and of the date, January 12, 1960, on which the zoning amendment would be considered. We cannot accept plaintiffs' attempted distinction between a hearing which is under way and continued to a later date, and a hearing which never gets under way because of an announcement of its adjournment. The fact of public notice, followed by actual notice to all who responded to the public notice, is present in both instances.
*452 We are not here concerned with officially published cancellation of a hearing date in advance of the meeting itself. In such a situation, the public might arguably be misled into expecting subsequent republication of the date of the adjourned hearing. (There is an indication in the record that a local newspaper article of December 7, 1959 may have mentioned that consideration of the amendment would not take place on the following night, with no specification of a new date. Even accepting this as true, we do not consider it fatal to the ordinance, in the light of the turn-out of 100 persons on December 8 and the even greater attendance of 500 citizens at the January 12 meeting. The ordinance was a "hot issue" in town, commanding the attention of the press and of all interested parties. Opposition to the amendment was obviously well organized, as attested to by a petition signed by 2,835 objectors to the ordinance. No claim is made by any of the principals that they were unaware of the adjourned date. In fact, the interim period  December 8 to January 12  actually afforded the opponents of the ordinance, led by the present plaintiffs, an opportunity to prepare, for presentation at the meeting, a "feasibility report," an alleged study of the adverse economic effects of apartment units in residential areas. The claim of inadequate notice must therefore be rejected.)

III.
Plaintiffs' assertion that the amendatory ordinance is not in accordance with a comprehensive plan, and is inconsistent with the zoning purposes set forth in R.S. 40:55-32, is predicated upon the assumption that the ordinance as amended permits the erection of multiple dwelling units in ten of the township's eleven districts. Insofar as this assumption is based on the vague and conflicting testimony of certain Planning Board members, a Committeeman, and a planning consultant, called as an expert witness, it cannot be given any credence. The language of the ordinance, *453 construed in terms of the surrounding circumstances, is what determines its meaning, and neither the faulty memories of those who enacted it nor the constructional conclusions of expert witnesses may remove final interpretation of that language from the domain of the trial judge.
To the extent that the plaintiffs' assumption rests on a reading of the amendatory language, our examination thereof shows that reading to be incorrect. The amendment expressly permits multiple dwelling groups (subject, of course, to the mechanics of Board of Adjustment approval) in R-1 districts, and expressly amends the R-2 and R-3 districts to permit them in the same manner as R-1. All principal uses permitted in R-3 districts are specifically sanctioned in R-4 districts. C-1 districts allow the permitted principal uses and buildings of R-3 districts.
But, contrary to plaintiffs' understanding, multiple dwelling units are not allowed in any of the remaining three commercial districts or, with one minor exception, in the three manufacturing districts. The reference to permitted uses in these districts is subject to the further condition that they not be expressly prohibited in another section of the ordinance. All Residential uses are expressly prohibited in C-4 districts. In C-3 districts, the prohibited uses include those barred in C-4 zones; and in C-2 districts, the provisions of the C-3 district apply. Residential uses are explicitly banned in M-2 and M-3 districts, and in M-1 districts, residences and other R-1 uses are permitted "subject to the requirement that any residences shall be permitted only as a continuous extension of an adjacent continually built up residential area."
In effect, then, the ordinance as amended sanctions multiple dwelling units in residential areas of the township, in the Professional and Office district (C-1), and, should the surrounding area be predominantly residential, in the Research and Limited Manufacturing district (M-1).
The requisite test of the validity of a municipal zoning ordinance is its reasonable relation to the objectives *454 of land use regulation as set forth in R.S. 40:55-32. The burden of demonstrating that the districting of certain uses is arbitrary and capricious rests upon the proponent of such a proposition and debatable questions are resolved in favor of upholding the legislative judgment. Bogert v. Washington Twp., 25 N.J. 57, 62 (1957). Plaintiffs have plainly failed to shoulder that burden herein. Their key claim, that multiple dwelling units constitute a "floating use" which might be placed in almost any of the township's districts, has been shown to be erroneous. The reasonableness of the existing classification is manifest and does not provoke serious dispute from plaintiffs. On this issue, then, the ordinance must be upheld as a reasonable exercise of the municipal legislative power.

IV.
Plaintiffs contend that the Board of Adjustment has been vested with broad powers by the ordinance, far beyond the scope of its statutory authority. This contention is in fact based upon the "floating use" assumption rejected in Part III, supra, and involves the proposition that the Board of Adjustment could not exercise a permissive power denied to the legislature itself.
It is clear, however, that if we begin on the correct premise that multiple dwelling units may be considered for approval only in Residential and Professional districts, the amendatory ordinance prescribes a comprehensive and well-considered set of criteria as conditions precedent to approval of proposed multiple dwellings. Among the factors to be weighed and the requirements to be met for Board of Adjustment approval are: absence of detriment to surrounding areas, economic stability and advantage to the community, sufficient but not excessive acreage, proximity to and feasibility of attachment to the municipal sewerage system, building height, provision for off-street parking, distance from private property lines and public ways, adequate light and air, number *455 of rooms, pavement of public ways within the project, and total number of units in the township. These standards, set out in greater detail in the ordinance, represent an intelligent adaptation of the "special exception" machinery of N.J.S.A. 40:55-39 (b), allocating to boards of adjustment the power to
"Hear and decide, in accordance with the provisions of any such ordinance, requests for special exceptions or for interpretation of the map or for decisions upon other special questions upon which such board is authorized by any such ordinance to pass."
The discussion of "special exceptions" by Judge (now Justice) Hall in Tullo v. Millburn Twp., 54 N.J. Super. 483, 490-91 (App. Div. 1959), has yet to be improved upon:
"* * * The theory is that certain uses, considered by the local legislative body to be essential or desirable for the welfare of the community and its citizenry or substantial segments of it, are entirely appropriate and not essentially incompatible with the basic uses in any zone (or in certain particular zones), but not at every or any location therein or without restrictions or conditions being imposed by reason of special problems the use or its particular location in relation to neighboring properties presents from a zoning standpoint, such as traffic congestion, safety, health, noise, and the like. The enabling act therefore permits the local ordinance to require approval of the local administrative agency as to the location of such use within the zone. If the board finds compliance with the standards or requisites set forth in the ordinance, the right to the exception exists, subject to such specific safeguarding conditions as the agency may impose by reason of the nature, location and incidents of the particular use. Without intending here to be inclusive or to prescribe limits, the uses so treated are generally those serving considerable numbers of people, such as private schools, clubs, hospitals and even churches, as distinguished from governmental structures or activities on the one hand and strictly individual residences or businesses on the other. This method of zoning treatment is also frequently extended to certain unusual kinds of strictly private business or activity which, though desirable and compatible, may by their nature present peculiar zoning problems or have unduly unfavorable effect on their neighbors if not specially regulated."
We have no difficulty in perceiving the unique and troublesome problems attendant upon location of apartment units *456 in a predominantly residential district, and the need for administrative determination, in accordance with properly outlined standards, of each case on its particular merits. Aside from the objective, mathematically calculable factors, there must also be considered the particular region sought to be used in an otherwise permissible district, especially in regard to such variable aspects as traffic congestion, school location, public transportation, and proximity to commercial areas and to other multiple unit projects. By ordinance, a municipality can make no more than generalized value judgments; where particularization is necessary, administrative refinement must be relied upon  and that refinement is provided, hopefully, by the Board of Adjustment. Plaintiffs' challenge to the "special exception" procedure is therefore without foundation.

V.
Plaintiffs assail the rezoning, also included in the amendatory ordinance, of certain commercial property bordering Route 18 in the township as not in accordance with any comprehensive plan; as an additional basis of attack, they charge that certain municipal officials responsible for enactment of the ordinance had no knowledge of precisely what had been accomplished therein. While the testimony is conflicting as to whether the rezoning of the property, to C-3, was from C-1 or C-2, this is immaterial to the legal issue presented. The burden rested upon plaintiffs to show the unreasonableness of the zoning change. This they failed to demonstrate. The evidence indicated a variety of non-conforming uses along the highway, thus providing a sound basis for rezoning. Whether the change was induced by any "specific studies," a proposition which plaintiffs answer negatively, is not determinative. The question must always be: Is the change a reasonable one in light of the time-repeated zoning objectives? We are in accord with the trial judge's ruling that the present alterations have been shown to have sound basis in reason.
*457 The knowledge and memory of the municipal officials are germane only to the extent that they shed light on possible self-interest interfering with exercise of an independent judgment. The attempted connection in this regard has, as heretofore concluded, proved unsuccessful. In the present circumstances, the contention is not well taken. The legislative process, whatever its shortcomings, is designed to produce beneficial and farsighted regulatory social codes by means of the votes of intelligent and devoted democratic leaders. If the product falls far short of this goal, there may at times be recourse to the courts; but if merely the competence of the producers is at issue, the exclusive remedy lies at the polls.
Judgment affirmed.