259 N.J. Super. 1 (1992)
611 A.2d 128
RICHARD MILLER, PLAINTIFF-RESPONDENT,
v.
PASSAIC VALLEY WATER COMMISSION, A PUBLIC BODY OF THE STATE OF NEW JERSEY, AND ROCCO TRIFARI, DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued June 9, 1992.
Decided July 28, 1992.
*3 Before Judges O'BRIEN, HAVEY and BRAITHWAITE.
Harold Goldman argued the cause for appellant Passaic Valley Water Commission (William Rosenberg, attorney; Harold Goldman, of counsel and on the brief).
Terence P. Corcoran argued the cause for appellant Rocco Trifari (Fiorello, Corrado, Corcoran, Cifelli & Damiano, attorneys; Terence P. Corcoran, of counsel and on the brief).
Gary D. Gordon argued the cause for respondent.
The opinion of the court was delivered by O'BRIEN, J.A.D.
*4 Defendants, Passaic Valley Water Commission (PVWC) and Rocco Trifari (Trifari) appeal from an order of the Law Division ordering PVWC to enter into a lease with plaintiff Richard Miller (herein plaintiff or Miller) for certain property owned by PVWC and requiring Trifari to vacate those premises. We reverse and remand.
PVWC is a water works formed and operating pursuant to N.J.S.A. 40:62-109 and is the owner of a small triangular parcel of land abutting Route 46 in Totowa, New Jersey, through which an underground water pipe runs. After the solicitation of bids pursuant to N.J.S.A. 40A:12-14, PVWC leased the premises in question (p.q.) to defendant Trifari by lease dated November 1, 1981. The term of the lease was for ten years commencing November 1, 1981 and ending on October 31, 1991. The p.q. were to be occupied solely for the purpose of selling food from mobile facilities with no permanent structures and for the sale of Christmas trees.[1] The gross rental for the ten-year term was $18,000, payable in 120 equal monthly installments of $150. Trifari, as tenant, also agreed to pay the real estate taxes. PVWC reserved the right to enter the p.q. to maintain, repair and replace its existing water pipes, and Trifari paid a security deposit of $1,800, together with a performance bond guaranteeing payment of the gross rental.
Seven commissioners (commission) have been appointed to administer and set policy as the PVWC for the three owner cities, Clifton, Passaic and Paterson (increased in 1989 from 4 commissioners). See N.J.S.A. 40:62-110.1. In the summer of *5 1991, the commission became aware of the upcoming expiration of the Trifari lease on October 31, 1991. The p.q. was minuscule in comparison to the overall operation of PVWC. Further, many of the present commissioners were not members of the commission at the time the lease with Trifari was entered into.
The law department of PVWC was directed to prepare an invitation to bid and specifications to be publicly advertised for the receipt of sealed bids on October 1, 1991, pursuant to N.J.S.A. 40A:12-14(a). The invitation to bid advised that the sealed bids would be publicly opened and read on October 1, 1991, and "[i]mmediately after opening of seals [sic] bids, an open public sale and auction will be conducted."[2] In a supplement to the invitation to bid, PVWC stated that the length of the lease proposed would be for ten years at an aggregate minimum rental over the life of the lease of $36,000, plus payment of real estate taxes.
In the invitation to bid, PVWC reserved the right to reject any bid wherein it was indicated that the use of the premises *6 would be contrary to the best interests of the commission and the public and also specifically contained a provision:

Section 1-6.0 The Commission reserves the right to reject any and all bids; to waive any defects or informalities in bids received, and to accept any bid which it deems most favorable to the commission at the time and under the circumstances prevailing.
On October 1, 1991, the sealed bids were opened, revealing that Miller had bid $46,000 and Trifari had bid $36,000 for the ten-year lease term. Following the opening of the sealed bids, a public auction was held at which Miller and Trifari participated, and Miller made the high bid of $71,000 over Trifari's last bid of $70,000, and Miller deposited the requisite 10%.
When the results of the bidding and auction were reported in the press, there were expressions of concern that as a result Trifari, who has been blind since birth, would be dispossessed from the property upon which he had operated his business for many years. Allegedly, this was followed by a public outcry and expressions of sympathy for Trifari. The commission concedes that this publicity and emotional public response served as a catalyst for the commission to focus with greater intensity on the use and value of the property.
The commission conducted a workshop session on October 9, 1991, at which there was a lengthy discussion of the bid process and the results. Comment was offered by the public, including the Mayor of Paterson, who was also a state assemblyman. While there were expressions of sympathy for Mr. Trifari and comment about his being a good neighbor and a landmark in Passaic County, as well as having proven his financial value, one of the commissioners suggested he would be interested in financial statements not only from the current tenant but from any other bidder. This commissioner observed, after stating that he felt all bids should be rejected,
I'd like to see some financial statements submitted with a new bid after rejecting this first bid. The financial statements not only by the current tenant, if he's interested in bidding again, but also by anybody else who would be interested in making a bid. The second matter that disturbs me, and I need to resolve it within myself, is that we're dealing with a ten-year lease and there's *7 no cost of living nor other escalation in that time period. So we're basically going to be talking about making a decision where we're paying in 1991 dollars on money that's not due until the year 2000 or the turn of the century. Although I'm here as a commissioner, in my professional life I'm an attorney and I just feel that's wrong. I feel that maybe we should have the bids thrown out and reconsidered having that in mind; some kind of escalation of cost of living or otherwise.
The matter was continued until October 23, 1991. At that session, the president of the commission, Alan Levine, observed that the commission had three choices, (1) accept the bid of the highest bidder; (2) reject all bids; or (3) give it to a bidder who was not the highest bidder. Levine expressed his view that all the bids should be rejected and that the lease should not be for a ten-year period. The attorney for the commission confirmed the right of the commission to reject all bids. One of the commissioners suggested that they look into the potential for sale of the p.q., recognizing that it would require an easement because of the pipe running underneath it. He also recommended that the present lease with Trifari continue until new specifications could be drawn. In response to one of the commissioner's suggestion that they accept the bid of Trifari because he had been a good tenant, counsel for the committee advised they could not do that.
The commission expressed its unanimous desire to reject all bids and to form a committee to review and evaluate the alternatives available and report back. A formal resolution was adopted on October 23, 1991, rejecting all bids for the following reasons:
A. Reconsideration of the length of the lease based on the economies of Passaic Valley Water Commission, as to entering into a long term lease;
B. Exploring the possibility of the potential sale of the property;
C. Material modification of the specifications for the leasing of the property including but not limited to financial disclosures by prospective bidders.
The resolution also provided that Trifari continue to occupy the p.q. as a month-to-month tenant. A committee was appointed to study the question and report back.
Thereafter, the committee met and decided (1) against selling the property because of the 52-inch water transmission line *8 installed under it, and (2) recommended that the specifications be modified for re-bid by reducing the term to five years and providing for a 5% yearly rental increase instead of a fixed rental. These recommendations were adopted by the commission on November 13, 1991 and the law department was instructed to draft new specifications for immediate re-bid.
On November 14, 1991, plaintiff Miller filed a verified complaint in lieu of prerogative writs, together with an order to show cause, naming PVWC and Trifari as defendants. The complaint sought reversal of the resolution rejecting all bids and an order requiring PVWC to award the contract to Miller. The order to show cause was made returnable on December 2, 1991 and temporarily restrained PVWC from proceeding with redrafting of contract specifications and soliciting new bids. PVWC filed an answer on November 21, 1991 and, although Trifari did not file a responsive pleading, a hearing was conducted on December 2, 1991, resulting in the entry of the final order on December 3, 1991 from which this appeal is taken.[3] The trial judge denied a stay of his order, and Trifari filed an emergent notice of appeal and application for a stay.[4] A one-judge order was entered on December 3, 1991, pursuant to R. 2:9-8, followed by a three-judge order entered December 4, 1991, granting a stay pending appeal. Plaintiff's application to the Supreme Court to vacate the stay was denied on December 10, 1991.
Initially, Miller argues that, since his claim included a demand for counsel fees and damages which were not considered *9 by the trial judge, the appeal is interlocutory. A proposed consent order to certify the judgment as final pursuant to R. 4:42-2 was not entered. Neither defendant sought leave to appeal, but the question of the interlocutory nature of the appeal was not raised at the time of the application for emergent relief. When an appeal has been improvidently filed, a respondent has a responsibility to the court to file a timely motion to dismiss the appeal. Brown v. Brown, 147 N.J. Super. 156, 157, 370 A.2d 895 (App.Div. 1977). Since this matter involves public property we directed that the appeal be accelerated. The matter has been fully briefed and argued. We have therefore decided to exercise our power to grant leave to appeal nunc pro tunc. See Delbridge v. Jann Holding Co., 164 N.J. Super. 506, 509, 397 A.2d 356 (App.Div. 1978).
Appellants argue that the trial judge committed error in his denial of PVWC's motion to dismiss the complaint because at the hearing plaintiff did not present any evidence to rebut the presumption of the validity of the governmental action. Appellants also argue that the trial judge violated R. 4:67-2 in the manner in which he proceeded summarily, and R. 4:69-2 in his treatment of the matter as a motion for summary judgment in the absence of any supporting affidavits and all before Trifari had filed any responding pleadings which were not yet due. In view of our decision, we deem it unnecessary to resolve these procedural questions.
At the hearing on December 2, 1991, plaintiff did not present any witnesses, stating that he was relying on the minutes of the work sessions of PVWC, although they were not offered into evidence by plaintiff. The judge recognized this, but assumed they were the minutes of the public body. The judge also recognized that he did not have the right to examine the motives of the commissioners in the absence of an allegation of fraud or self-interest. In denying the motion to dismiss, the judge said he relied on the minutes and the resolution of the commission, but that a rejection of all bids cannot be arbitrary, citing Cardell, Inc. v. Township of Woodbridge, 115 N.J. Super. *10 442, 280 A.2d 203 (App.Div. 1971), certif. denied, 60 N.J. 236, 287 A.2d 733 (1972). The judge then stated,
So, based on the premises and presumptions that I have to indulge in at this motion, certainly the motion to dismiss is denied because it is reasonable to conclude that the rejection was inappropriate, certainly at this circumstance of the hearing.
The trial judge then received testimony from three witnesses presented by PVWC, its assistant counsel, its administrative secretary, and Alan Levine, its president. Mr. Levine confirmed his comments at the October 9 and October 23 work sessions as revealed in the minutes. He also testified as to the reasons supporting the commission's resolution:
Well, the reason was that we found out the property was exceptionally valuable, a lot more than we thought. When the first time we even heard of the property, we really knew nothing about it because it happened ten years ago, and most of the commissioners were not even on the Commission at the time, so it was like a new game to us. And after realizing this, ten years might be too long to go out on a lease on a piece of property, and again, burden the future commissioners with the economic changes that are going on.
We felt the Commission could financially benefit from having, you know  the end results of the committee that was established with the attorneys that we could benefit, financially, the Commission, in doing this, in going out on a shorter lease, have, you know, escalation costs, and possibly also looking at selling the land. So, we felt the Commission, in owing up to its [At this point a problem arose with the recording equipment.]
After the equipment problem was corrected, the witness continued with his response, noting the appointment of a committee and reiterating what he had said earlier. He acknowledged he was aware that Mr. Trifari was blind and he was specifically asked by the attorney for PVWC:
Q. And did that  did the fact that he was blind enter into your consideration or determination in any way?
A. No, because I think I said in the minutes, I told you to keep quiet and don't give me any more sentiment, just tell me what the law is. Is that correct? That's what I told you.
In response to a question on cross-examination, Mr. Levine said that the main reason for the commission's action was economics. He acknowledged that because of the shortness of time they had not had an appraisal made of the p.q.
*11 In reaching his decision, the judge concluded that the relevant facts were not in dispute. The judge then analogized the leasing of public property to the bidding for public improvements, citing cases such as Paterson Contracting Co. v. Hackensack, 99 N.J.L. 260, 122 A. 741 (E. & A. 1923), and Sellitto v. Cedar Grove, 132 N.J.L. 29, 38 A.2d 185 (S.Ct. 1944). He then referred to the rejection of bids as discussed by us in Cardell, Inc. v. Tp. of Woodbridge, supra, and Princeton Disposal Serv. v. Tp. of No. Brunswick, 154 N.J. Super. 488, 381 A.2d 1220 (App.Div. 1977), certif. denied 75 N.J. 608, 384 A.2d 838 (1978) and concluded:
Now, I don't suggest that in appropriate occasions there may be other reasons why a bid may be suggested [sic]. But the reason that was suggested here, that there's an economic reason, is not an appropriate reason under these circumstances.
Nothing changed before the Commission from the time it first decided to make it  to offer the property for lease in September of 1991 and the end of October, other than the fact than the bids came in higher than the Passaic Valley Water Commission anticipated.
Now, if the Passaic Valley Water Commission can advertise for lease of property this way and decide that they're going to reject the bids just because they now realize that they may be able to make more money, that's unfair to bidders and unfair in the long run to the members of the Passaic Valley Water Commission, because the process is violated in that bidders will not be discouraged from bidding, which is the exact reasoning that our cases that I've mentioned enforce.
Now, we've talked about the motive of the Passaic Valley Water Commission and as Mr. Corcoran points out, a motive is not an issue in a case involving the conduct of a municipal or governing body, absent fraud or personal interest or corruption and is not suggested in any reason  in any way that any of these things apply here. And counsel has referred to LaRue v. East Brunswick, at 68 N.J. Super. 435, page 455, [172 A.2d 691] an Appellate Division decision in 1961 and there are many others.
The judge then noted his review of the minutes of the meetings and the fact that one of the committee members is a realtor, ultimately concluding:
So, there was nothing economically that changed. There was nothing economically different from September, 1991 to October 23, 1991. There is nothing that the Passaic Valley Water Commission could know at the end of October that it couldn't know at the beginning of September. The only thing that changed, as I said before and as counsel had pointed out, the amount of the bid that was made. And again, to allow the Passaic Valley Water Commission to *12 decide that because now it was able to get higher bids, that it has a right to reject all bids, would violate the entire theory and foundation of the bidding statute, because bidding would be discouraged.
I agree that the court cannot substitute its judgment for the judgment of the Passaic Valley Water Commission. Only, but that I should say there are two exceptions.
Passaic Valley Water Commission, if it acts illegally or it acts to avoid the purposes of a law and the principles controlling governmental action, can't escape judicial scrutiny under the guise of business judgment. And that's not really a substitution of the court's judgment for the judgment of the Passaic Valley Water Commission. I agree that the principle simply is that the court can't substitute its judgment. I agree with it wholeheartedly. But the court has a function to perform and that function is to enforce the statute, as written and as interpreted.
The absence of bad faith or even the presence of good faith, does not preclude judicial examination and remedy. Here, the Passaic Valley Water Commission's attempt to arbitrarily reject all bids offended the purposes of the bidding statute and cannot be tolerated.
The judge then found in favor of Miller. We disagree.
We agree with plaintiff that the Local Public Contracts Law, N.J.S.A. 40A:11-1 to 49, and the Local Lands and Buildings Law, N.J.S.A. 40A:12-1 to 38, should be interpreted in pari materia since both statutes serve the same purpose, namely, the elimination of corruption, favoritism and extravagance. Asbury Park Press v. City of Asbury Park, 19 N.J. 183, 115 A.2d 564 (1955); Disposmatic Corp. v. Mayor & Council of Kearny, 162 N.J. Super. 489, 393 A.2d 610 (Ch.Div. 1978). Bidding statutes are for the benefit of the taxpayers and are construed as nearly as possible with sole reference to the public good. Their objects are to guard against favoritism, improvidence, extravagance and corruption; their aim is to secure for the public the benefits of unfettered competition. Terminal Construction Co. v. Atlantic City Sewerage Authority, 67 N.J. 403, 409-10, 341 A.2d 327 (1975). Statutes directed towards these ends are to be rigidly adhered to by the court. Township of Hillside v. Sternin, 25 N.J. 317, 136 A.2d 265 (1957).
In a case relied upon by the trial judge, Paterson Contracting Co. v. Hackensack, supra, 99 N.J.L. 260, 122 A. *13 741 the Court of Errors and Appeals expressed the purpose of bidding statutes as:
To encourage contractors to submit bids for public improvement should be the aim of every community. Numerous bidders create competition. Competition lowers the cost. If bids are rejected arbitrarily or capriciously contractors will not take the time and expend the money necessary to submit proposals. They will infer favoritism. This will result in few bidders and higher bids. The statute providing for the award of a contract for a public improvement to the lowest responsible bidder was enacted for the protection of bidders. [Id. at 264, 122 A. 741.]
A governmental body has the power to reject all bids under proper circumstances. Cardell, Inc. v. Tp. of Woodbridge, supra, 115 N.J. Super. at 450, 280 A.2d 203. However, the unbridled power to reject bids, even where such right is reserved in the invitation for bidding, if allowed, would violate our public policy, contravene our Legislature's intention in enacting the competitive bidding statute and, in fact, afford a means by which "the statute can be evaded under color of the rejection of `any and all bids.'" Id. Thus, the public body does not have the right to arbitrarily reject bids. Id. at 449, 280 A.2d 203.
Thus, the question presented in this case is whether the rejection of both bids for the lease of the p.q. by PVWC was arbitrary. As stated in Cardell,
When a [public] body concludes in good faith that the purposes of the public bidding statute are being violated, it may reject all bids submitted and in its discretion order a readvertising of the contract. Furthermore, should the lowest bid substantially exceed the [body's] cost estimate or its appropriation for the job, or should circumstances arise which might cause the [body] to abandon or substantially revise the project, then the total rejection of bids might well be required. [115 N.J. Super. at 451, 280 A.2d 203.]
Miller suggests that his high bid in this case was rejected by PVWC out of sympathy for Trifari. However, the trial judge did not make such a finding, although after reaching his decision, he commented:
As commendable as the motives of the commissioners may have been, as Mr. DeVita indicated, they sought to assist Mr. Trifari because he had been a good tenant and for other reasons, this statute prohibits it doing exactly that. If the water commission attempted to do that and they recognized that they could not *14 do it, it would indicate they are acting to favor one person over every other person who might be willing to bid on this property.
Citing LaRue v. East Brunswick, 68 N.J. Super. 435, 172 A.2d 691 (App.Div. 1961), the trial judge recognized that,
Absent a showing of fraud, personal interest, or corruption, an authorized legislative enactment by a properly empowered municipal body is not subject to attack merely on the ground that the motives of the members of the governing body were questionable. [Id. at 445, 172 A.2d 691.]
In its brief, PVWC acknowledges that the public outcry because of a possibility that Trifari would lose his right to occupy the premises "served as the catalyst for the COMMISSION to focus with greater intensity on the use and value of the PROPERTY." Nonetheless, the reasons for the rejection were not based upon the admitted sympathy for Trifari, but rather on "economics" as testified to by Mr. Levine. As noted, the trial judge did not find that the rejection of all bids was based upon sympathy for Trifari. Rather, the trial judge found that the economic reasons upon which PVWC based its rejection were not "an appropriate reason under these circumstances." We disagree.
The judge found this rejection to have been unfair to bidders and ultimately to the public because it would discourage people from bidding. While there may be some merit to that conclusion, bidding statutes are for the benefit of the taxpayers and are construed as nearly as possible with sole reference to the public good. Terminal Construction Co. v. Atlantic City Sewerage Authority, supra. There is a prima facie presumption that the power and discretion of governmental action has been properly exercised. Grundlehner v. Dangler, 51 N.J. Super. 53, 61, 143 A.2d 192 (App.Div. 1958), modified, 29 N.J. 256, 148 A.2d 806 (1959). This presumption is the effective check against judicial interference with executive and legislative actions. Southern Burlington County NAACP v. Mt. Laurel Twp., 92 N.J. 158, 456 A.2d 390 (1983), on remand, 207 N.J. Super. 169, 504 A.2d 66 (Law Div. 1985). The good faith of public officials is to be presumed; their determinations are not to be approached with a general feeling of suspicion. *15 Ward v. Scott, 16 N.J. 16, 23, 105 A.2d 851 (1954); N.J. Highway Authority v. Curry, 35 N.J. Super. 525, 532, 114 A.2d 587 (App.Div. 1955). The trial court may not in the exercise of its judicial function substitute its judgment for that of the governmental body being challenged. Demarest v. Mayor & Council of Borough of Hillsdale, 158 N.J. Super. 507, 510, 386 A.2d 875 (App.Div.), certif. denied 78 N.J. 331, 395 A.2d 200 (1978). The obligation of public officials to award to the lowest responsible bidder or to the responsible bidder whose bid is most advantageous to the public authority in no way changes the basic rule or the nature or extent of the correlative rights and duties as between a bidder and the solicitor of the bid. For, that obligation is imposed for the public good, not for the benefit of the bidder. M.A. Stephen Const. Co. v. Borough of Rumson, 125 N.J. Super. 67, 73, 308 A.2d 380 (App.Div. 1973), certif. denied 64 N.J. 315, 315 A.2d 404 (1973).
Here, the trial judge dismissed out of hand the economic reasons ascribed by the commissioners of PVWC and testified to by its president, Levine. The judge found the rejection of all bids unfair to bidders simply because the commissioners decided that it would be more beneficial to the public to reject all bids. The judge concluded that nothing had happened from the time the commission first advertised for bids for a lease on the p.q. in September 1991 and the end of October. However, he acknowledged that "the bids came in higher than the PVWC anticipated." This certainly alerted the present commissioners, who had nothing to do with the original lease to Trifari some ten years earlier, to the fact that the p.q. had a much greater value than simply double the rent that had been received over the last ten years.
We see nothing improper in the decision of the commissioners to explore the potential for selling the p.q., thereby receiving its value immediately, or in leasing for a shorter term with a cost of living escalation, rather than for a fixed amount of rental over a new ten-year term thereby binding subsequent commissioners *16 to what may prove to be a totally inadequate rental. The testimony by Mr. Levine was uncontradicted and clearly spelled out sound economic reasons for the decision to reject all bids, form a committee to explore the potential for sale or leasing on different terms, and to require some form of financial security from potential tenants. These reasons should not be viewed with suspicion simply because of the public sympathy engendered by Trifari's handicap and the recognition that he had been a very good tenant. The decision of the trial judge improperly substituted his judgment for that of the commissioners, thereby causing him to reach an improper conclusion that the commissioners were legally obliged to accept plaintiff's bid and lease the p.q. to him.
Plaintiff also asserts the impropriety of the decision by PVWC to permit Trifari to continue to occupy the p.q. subsequent to the termination of his lease on a month-to-month basis upon the payment of the same rental. Plaintiff alleges this to have been a violation of N.J.S.A. 40A:12-14, based upon our opinion in City of Jersey City v. Roosevelt Stadium, 210 N.J. Super. 315, 325, 509 A.2d 808 (App.Div. 1986). In that case, the city sought relief from a final order and judgment entered, without its consent or after a trial, based upon a settlement which it had not approved. While we did conclude in that case that N.J.S.A. 40A:12-14(a) applied equally to the extension of leases as well as to new leases, we believe that, in the setting of this case, it was totally appropriate for the commissioners to permit continued occupancy on a month-to-month basis under the same rental. Trifari had occupied the premises for over ten years and had made substantial improvements, such as the installation of driveway cuts, macadam, and brought in electric, gas and water to supply his large food dispensing trailer. According to his certification, Trifari had been operating at the site since 1949, when his father first utilized it for the sale of fruits, vegetables and nursery products. Furthermore, pursuant to his lease, Trifari had paid a security deposit representing one year's rent. Under these unique circumstances, we see *17 nothing improper in permitting him to occupy the premises as a month-to-month tenant pending readvertising for bids or a new auction.
Reversed and remanded for the entry of judgment in favor of defendants dismissing plaintiff's complaint.
NOTES
[1] On July 19, 1982 the township committee of Little Falls adopted a resolution granting Trifari a use variance and other necessary variances to use the premises for the business he had been operating at that location for the previous seven years. The board found the configuration and location of the property to be unique, both because of its triangular shape as well as its relationship to both roadways. The variance was found to be "personal" to Trifari.
[2] Although for purposes of the decision in this case it makes no difference, since Miller submitted both the highest sealed bid and the highest bid at the auction, we question the propriety of soliciting sealed bids and, in addition, providing for open public bidding at auction. N.J.S.A. 40A:12-14 speaks in the disjunctive in saying, "said lease shall be made to the highest bidder by open public bidding at auction or by submission of sealed bids." [emphasis added] We observe that the committee statement annexed to Senate Bill No. 1968, which became the Laws of 1983, chapter 440, (N.J.S.A. 40A:12-14) reads as follows:

Senate Bill No. 1968 would permit local governments in leasing public property under the "Local Lands and Buildings Law," P.L. 1971, c. 199 (C. 40A:12-1 et seq.) to award leases either by open public bidding at auction or by submission of sealed bids. The method of bidding would be required to be set forth in the advertisement of the lease.
Under current law, local governments are required to lease public property under the sealed bids procedure, but are required to sell public property under the open public bidding at auction method.
In response to our questions concerning this at oral argument, we were advised that in practice this dual method of both sealed bids and public auction is used in leasing public land. As noted, we question the propriety of that practice.
[3] A notice of appeal was filed on December 3, 1991 by Trifari. It is not clear whether PVWC also appealed. A civil appeal case information statement was filed on January 2, 1992 by PVWC, suggesting that both defendants appealed.
[4] The application was emergent since both Trifari and Miller are engaged in the sale of Christmas trees, Trifari from the p.q. and Miller from an adjoining piece of property. Trifari argued that a large number of trees had been ordered and paid for, which would be lost if he was unable to continue with his Christmas tree business on the p.q.