852 A.2d 1114

STATE OF NEW JERSEY, BY AND THROUGH THE COUNTY OF CUMBERLAND, PLAINTIFF–APPELLANT, v. ONE 1990 FORD THUNDERBIRD, BEARING NEW JERSEY REGISTRATION YB158W, DEFENDANT IN REM, AND CAROL THOMAS, DEFENDANT/COUNTERCLAIMANT–RESPONDENT, v. STATE OF NEW JERSEY, BY AND THROUGH THE COUNTY OF CUMBERLAND, AND PETER C. HARVEY, ATTORNEY GENERAL OF NEW JERSEY, AND THE COUNTY OF CUMBERLAND, COUNTERCLAIM DEFENDANTS–APPELLANTS.

Superior Court of New Jersey
Appellate Division

Argued March 31, 2004—Decided July 21, 2004.

Before Judges KESTIN, CUFF and LARIO.

*Boris Moczula,* Assistant Attorney General, argued the cause for appellants (*Peter C. Harvey,* Attorney General, pro se and attorney for appellants; *Linda K. Danielson,* Deputy Attorney General, of counsel and on the brief).

*Scott G. Bullock,* of the Pennsylvania and District of Columbia bars, admitted pro hac vice, argued the cause for respondent (*Jacob & Chiarello* and *Scott G. Bullock* attorneys; *Joseph M. Chiarello* and *Mr. Bullock,* on the brief).

*Robert D. Bernardi,* Burlington County Prosecutor, argued the cause for amicus curiae County Prosecutors Association of New Jersey (*Dolores M. Blackburn,* Sussex County Prosecutor and *Mary R. Juliano,* Assistant Monmouth County Prosecutor, attorneys; *Ms. Blackburn,* of counsel; *Ms. Juliano,* on the brief).

*Edward Barocas,* Legal Director, argued the cause for amicus curiae American Civil Liberties Union of New Jersey.

*Martin S. Kaufman,* of the New York bar, admitted pro hac vice, argued the cause for amici curiae National Association of Criminal Defense Lawyers and Association of Criminal Defense Lawyers of New Jersey (*Gibbons, Del Deo, Dolan, Griffinger & Vecchione,* and *Atlantic Legal Foundation, Inc.,* attorneys; *Lawrence S. Lustberg* and *Mr. Kaufman,* on the brief).

The opinion of the court was delivered by

KESTIN, P.J.A.D.

The focal issue in this case is the constitutionality of New Jersey's criminal instrumentality forfeiture law, *N.J.S.A.* 2C:64–1 to –9 (the Act). The trial court held that the seizure of a motor vehicle pursuant to *N.J.S.A.* 2C:64–6a violated the owner's federal and State due process rights. We reverse.

I

This proceeding arose on June 22, 1999, when the Cumberland County Prosecutor filed a verified civil action complaint *in rem* on behalf of the State of New Jersey, seeking forfeiture of the motor vehicle. *See N.J.S.A.* 2C:64–3. The complaint alleges that the vehicle had been confiscated following its use by Rexford McCaffrey in connection with a series of marijuana sales; that it was registered to Carol McCaffrey, his mother; and that Rexford McCaffrey was its *de facto* owner.

Carol McCaffrey (counterclaimant) filed a timely answer denying the key allegations of the complaint and pleading six separate defenses. In an amended answer and counterclaim filed under the name of Carol Thomas on May 22, 2000, after a cognate suit in federal court pursuant to 42 *U.S.C.A.* § 1983 had been dismissed, counterclaimant added two separate defenses asserting the unconstitutionality of *N.J.S.A.* 2C:64–6a, under both the Fifth Amendment to the United States Constitution and Article one, Paragraph one of the New Jersey Constitution. The counterclaim—against the State, the Attorney General, and Cumberland County—articulated in detail the constitutional violations charged and the theories upon which the assertions of unconstitutionality are based.

The gravamina of the constitutional challenge are framed in two paragraphs of the counterclaim:

25. In New Jersey, the agencies seizing and prosecuting forfeitures are entitled to keep and benefit from the property or currency forfeited to the government. Seizing and prosecuting agencies in New Jersey are thus granted a direct financial stake in the outcome of forfeiture efforts.

26. When public officials and their agencies have a direct financial stake in the outcome of their actions, due process requires that such actions be subject to particularly close scrutiny. By mandating that property subject to forfeiture, and the proceeds from the sale of such property, be channeled directly to the officials and bodies charged with enforcing and prosecuting the law, *N.J.S.A.* 2C:64–6a on its face and as applied creates the potential for bias, the appearance of bias, and/or actual bias in the administration of New Jersey's civil forfeiture law.

Counterclaimant seeks a declaratory judgment, injunctive relief, and an order granting reasonable attorneys' fees and costs. The State and the Attorney General in one pleading, and Cumberland

County in another, joined issue on the counterclaim with denials of unconstitutionality and in twenty separate defenses. Thereafter, the Attorney General superseded the Cumberland County Prosecutor as attorney for the State. We refer to the governmental parties, collectively, as "the State."

On January 19, 2001, the trial court entered an order on the State's motion, apparently with counterclaimant's consent, vacating a $1,500 cash bond that had been substituted for the vehicle as permitted by *N.J.S.A.* 2C:64–3g, and dismissing the forfeiture complaint pursuant to *R.* 4:37–1(b). The trial court, also, denied the State's *R.* 4:6–2(a) motion to dismiss the counterclaim for lack of subject matter jurisdiction.

On November 12, 2002, the trial court heard oral argument on cross-motions for summary judgment addressed to the counterclaim's "liability" features, *i.e.,* the constitutional issues. The court's grant of counterclaimant's motion was memorialized in an order entered on December 10, 2002. In a letter opinion dated December 11, 2002, the judge explained his reasons for declaring that "the seizure of [the] vehicle pursuant to *N.J.S.A.* 2C:64–6a, violated due process guarantees afforded by the U.S. and New Jersey Constitutions." The opinion concluded: "A trial will be scheduled on [the] counterclaim as to damages."

The State moved for leave to appeal. On January 10, 2003, for reasons expressed in a letter of the same date, the trial judge entered an order granting the State's motion for a stay pending appeal. We granted leave to appeal on April 3, 2003.

## II

There has been no dispute regarding the facts alleged in the complaint that gave rise to the forfeiture claim. The questions before the trial court were purely matters of law. The same issues are raised on appeal.

*N.J.S.A.* 2C:64–6a, addressing the disposal of forfeited property, provides:

Property which has been forfeited shall be destroyed if it can serve no lawful purpose or it presents a danger to the public health, safety or welfare. All other forfeited property or any proceeds resulting from the forfeiture and all money seized pursuant to this chapter shall become the property of the entity funding the prosecuting agency involved and shall be disposed of, distributed, appropriated and used in accordance with the provisions of this chapter.

The prosecutor or the Attorney General, whichever is prosecuting the case, shall divide the forfeited property, any proceeds resulting from the forfeiture or any money seized pursuant to this chapter with any other entity where the other entity's law enforcement agency participated in the surveillance, investigation, arrest or prosecution resulting in the forfeiture, in proportion to the other entity's contribution to the surveillance, investigation, arrest or prosecution resulting in the forfeiture, as determined in the discretion of the prosecutor or the Attorney General, whichever is prosecuting the case. Notwithstanding any other provision of law, such forfeited property and proceeds shall be used solely for law enforcement purposes, and shall be designated for the exclusive use of the law enforcement agency which contributed to the surveillance, investigation, arrest or prosecution resulting in the forfeiture.

The Attorney General is authorized to promulgate rules and regulations to implement and enforce the provisions of this act.

Regulations entitled "Attorney General's Standards for the Equitable Distribution to Contributing Law Enforcement Agencies of Forfeited Property," *N.J.A.C.* 13:77–1.1 to –7.1, were adopted in 1988. They expired on March 23, 1998. *See N.J.A.C.* 13:77 (Chapter Historical Note; 30 *N.J.R.* 703(b) (Feb. 17, 1998)). Since that time, standard operating procedures (SOPs), also promulgated by the Attorney General, address the same subject matter.

SOP 2:6 provides that property forfeited to a law enforcement agency, or other property purchased with funds from the proceeds of forfeited property, shall be held by the agency for law enforcement purposes. SOP 12 sets forth the guidelines for distributing property to participating law enforcement agencies. SOP 12:1 states: "All forfeited property, and all funds derived from the sale, auction or other disposition of said property[,] shall be used solely for law enforcement purposes." SOP 12:4F provides:

"Law enforcement purpose" means a purpose which is calculated to enhance a law enforcement agency's ability to conduct criminal investigations, surveillances, arrests and prosecutions and to respond more fully to the effects of crime and, for purposes of these rules, shall be beyond that allocated by the law enforcement agency's annual budget. A law enforcement purpose shall include expenditures to

defray the costs of protracted or complex investigations; to educate the public in crime prevention techniques; to provide additional technical assistance or expertise, which may, for example, include participation in funding the purchase of Statewide automated fingerprint identification equipment, an automated uniform offense and arrest report system, the purchase of surveillance and undercover transportation and investigation equipment, and computer hardware and software to enhance the coordination and sharing of information among the law enforcement agencies of a county and the State; to provide matching funds to obtain Federal law enforcement enhancement grants, or for such other purposes as the Attorney General may from time to time authorize.

SOP 11-2 declares that expenditures to procure equipment, training, or services for a law enforcement agency, and for the funding of narcotics enforcement operations, including money to purchase evidence and information on criminal conduct, must have a law enforcement purpose. SOP 12:9A states that forfeiture funds are not to be used as a source of revenue to meet normal operating needs of a law enforcement agency, and that no funding entity may anticipate forfeitures or proceeds from forfeitures in the adoption of the budget for its law enforcement agency.

Although forfeiture funds may not be used for payment of regular salaries or to create new personnel positions, SOP 12:9B allows the Deputy Director of Operations of the Division of Criminal Justice to approve the use of forfeiture funds for salaries of temporary employees hired for specific functions, such as persons with special expertise needed for particular investigations. Various submissions by county prosecutors listing the distribution of forfeited property disclose that forfeiture funds have been used to fund overtime pay for regular employees.

Counterclaimant, in essentially accepting the State's recitation of the statutory and regulatory scheme under review, points out that, statewide, forfeitures totaled $31,618,100.31 in the three-year period from 1998 to 2000. Citing the prohibition against using forfeiture funds for regular salaries of law enforcement officials, except for the hiring of temporary employees, *see* SOP 12:9, counterclaimant stresses, *inter alia,* that such funds have been used to pay overtime salaries to regular employees.

## III

The trial court judge, in his opinion, noted that counterclaimant's "challenge comes on precise and narrow grounds," asserting due process violations emanating from the "statutory scheme ... [in which] the prosecuting authority which seizes property in its investigation and prosecuting of crimes ... keeps such property, or the cash proceeds of such property, for its own use." The trial court judge regarded that feature to be governed by the principles underlying *Marshall v. Jerrico, Inc.*, 446 *U.S.* 238, 100 *S.Ct.* 1610, 64 *L.Ed.*2d 182 (1980). There, the United States Supreme Court unanimously validated a statutory scheme in which "sums collected as civil penalties for the unlawful employment of child labor [were] returned to [the assessing administrative agency] in reimbursement for the costs of determining violations and assessing penalties." *Id.* at 239, 100 *S.Ct.* at 1611, 64 *L.Ed.*2d at 186. The Court provided a negative answer to the question presented: "whether this provision violates the Due Process Clause of the Fifth Amendment by creating an impermissible risk of bias in the Act's enforcement and administration." *Ibid.*

The trial court judge herein reached his conclusion of invalidity after reviewing data showing the amount of property forfeited, its distribution to county prosecutors' offices, and the budgets of those offices. In analyzing those figures, the judge accepted the State's theory that the forfeited funds available to county prosecutors, excluding distributions to other agencies, should be compared to the total county prosecutors' budgets. He concluded that New Jersey's statutory forfeiture scheme violated due process standards because the quantity of funds prosecutors received from forfeited property was more than just insubstantial or remote. He noted, by way of example, that one county prosecutor's office had increased its total appropriated budget by more than seven percent in one year, and that county prosecutors have used the proceeds from their seizures for training, office equipment, transportation, and a wide variety of professional aids and assistance.

In contending, on appeal, that the judge erred in granting summary judgment in favor of counterclaimant and declaring *N.J.S.A.* 2C:64–6a unconstitutional, the State argues: (1) statutes are presumed to be constitutional and the burden of demonstrating otherwise is on the party challenging the statute; (2) the prosecutors and the Attorney General, and hence the people of New Jersey, legitimately profit from civil suits for forfeiture of property; (3) under the statute, the Attorney General and county prosecutors are strictly civil plaintiffs and have no adjudicative functions, obviating any violation of due process guarantees; and (4) the rights of owners of property for which the State seeks forfeiture are safeguarded and afforded enhanced protection.

At oral argument before us, counterclaimant conceded that no problem of constitutional dimension would exist if the property or proceeds forfeited went directly to the State's general treasury. The flaw asserted in the challenge is that the forfeitures redound directly to the benefit of the prosecutorial entities initiating the claims.

## IV

In reviewing the decision of the trial court judge on the purely legal questions presented, we do not accord any special deference to the views he expressed. *See Manalapan Realty, L.P. v. Township Comm. of Manalapan,* 140 *N.J.* 366, 378, 658 A.2d 1230 (1995).

Although we disagree with the conclusions he reached, we do not discern that the judge misapplied the presumption of constitutionality accorded all statutes, which places the burden of establishing unconstitutionality on the party challenging the statute. *See State v. One 1990 Honda Accord,* 154 *N.J.* 373, 377, 712 A.2d 1148 (1998). Rather, in weighing the arguments advanced, the judge was clearly guided by the presumption of validity, but determined that it had been overcome.

We also find no fault with the motion judge's discretionary choice to consider the constitutional questions even though the

forfeiture complaint had been dismissed and the automobile had been returned to counterclaimant. *See Donadio v. Cunningham,* 58 *N.J.* 309, 325–26, 277 *A.*2d 375 (1971)("A court should not reach and determine a constitutional issue unless absolutely imperative in the disposition of the litigation."); *Ahto v. Weaver,* 39 *N.J.* 418, 428, 189 *A.*2d 27 (1963)(same). *See generally O'Keefe v. Passaic Valley Water Comm'n,* 132 *N.J.* 234, 240–42, 624 *A.*2d 578 (1993)(explicating the rationale and the history of this principle of restraint).

Neither party argues mootness, however. Counterclaimant has been affected by the application of the statute, incurring inconvenience if not also cost as a result of the State's claim. She is entitled to the declaratory judgment she seeks. *See New Jersey Ass'n for Retarded Citizens v. Department of Human Servs.,* 89 *N.J.* 234, 240–43, 445 *A.*2d 704 (1982); *Chamber of Commerce v. State of New Jersey,* 89 *N.J.* 131, 140–41, 445 *A.*2d 353 (1982). Moreover, the issues presented are of sufficient gravity to warrant judicial evaluation. The question of the validity of the forfeiture mechanism is a matter of public importance, subject to repetition but evading review whenever forfeiture complaints are dismissed in the face of constitutional challenges. *See Clark v. Degnan,* 83 *N.J.* 393, 397, 416 *A.*2d 816 (1980); *Busik v. Levine,* 63 *N.J.* 351, 364, 307 *A.*2d 571, appeal dismissed, 414 *U.S.* 1106, 94 *S.Ct.* 831, 38 *L.Ed.*2d 733 (1973); *Township of Montclair v. County of Essex,* 288 *N.J.Super.* 568, 571 n. 1, 672 *A.*2d 1222 (App.Div.1996).

## V

We discern no flaw of constitutional magnitude by reason of the fact that a forfeiture proceeding is typically commenced in the form of a civil action complaint, *see N.J.S.A.* 2C:64–3a, by the very prosecutorial entity to which the proceeds of the forfeiture will directly flow. The role of the court called upon to make an independent evaluation of the validity of the claim, in adjudicating the interests of the parties, provides the forfeiture mechanism

with the necessary insulation from unfairness and arbitrary application that principles of due process require.

■ In terms of federal due process standards, the Fifth Amendment "Due Process Clause entitles a person to an impartial and disinterested tribunal in both civil and criminal cases." *Marshall, supra,* 446 *U.S.* at 242, 100 *S.Ct.* at 1613, 64 *L.Ed.*2d at 188. In *Tumey v. Ohio,* 273 *U.S.* 510, 47 *S.Ct.* 437, 71 *L. Ed.* 749 (1927), the Court found a due process violation in an adjudicator's "direct, personal, pecuniary interest" in the outcome of a proceeding where that person's salary as a municipal judge depended directly on the fines he imposed, *id.* at 516–23, 47 *S.Ct.* at 438–41, 71 *L.Ed.* at 751–54, and where that person's additional role as mayor of the municipality gave him an apparent "official motive" to increase village revenues through the imposition of fines. *Id.* at 534–35, 47 *S.Ct.* at 445, 71 *L.Ed.* at 759.

Likewise, in *Ward v. Village of Monroeville,* 409 *U.S.* 57, 93 *S.Ct.* 80, 34 *L.Ed.*2d 267 (1972), the Court invalidated fines for traffic offenses in the "mayor's court" of the municipality, stressing the mayor's interest in generating municipal revenue as inconsistent, in the due process sense, with his role as the adjudicator of violation charges. Reflecting on *Tumey,* the Court held:

> The fact that the mayor there shared directly in the fees and costs did not define the limits of the principle. Although "the mere union of the executive power and the judicial power in him can not be said to violate due process of law," * * * the test is whether the mayor's situation is one "which would offer a possible temptation to the average man as a judge to forget the burden of proof required to convict the defendant, or which might lead him not to hold the balance nice, clear and true between the State and the accused[.]" * * * Plainly that "possible temptation" may also exist when the mayor's executive responsibilities for village finances may make him partisan to maintain the high level of contribution from the mayor's court. This, too, is a "situation in which an official perforce occupies two practically and seriously inconsistent positions, one partisan and the other judicial, [and] necessarily involves a lack of due process of law in the trial of defendants charged with crimes before him."

> [*Id.* at 60, 93 *S.Ct.* at 83, 34 *L.Ed.*2d at 270–71 (citations omitted).]

In *Connally v. Georgia,* 429 *U.S.* 245, 97 *S.Ct.* 546, 50 *L.Ed.*2d 444 (1977), state law provided:

> [T]he fee for the issuance of a search warrant by a Georgia justice of the peace "shall be" $5, "and it shall be lawful for said [justice] of the peace to charge and collect the same." If the requested warrant is refused, the justice of the peace collects no fee for reviewing and denying the application. The fee so charged apparently goes into county funds and from there to the issuing justice as compensation.
>
> [*Id.* at 246, 97 *S.Ct.* at 546–47, 50 *L.Ed.*2d at 446.]

In explaining its holding that such a scheme violates due process standards, the Court observed:

> The present case, of course, is not precisely the same as *Tumey* or as *Ward,* but the principle of those cases, we conclude, is applicable to the Georgia system for the issuance of search warrants by justices of the peace. The justice is not salaried. He is paid, so far as search warrants are concerned, by receipt of the fee prescribed by statute for his *issuance* of the warrant, and he receives nothing for his *denial* of the warrant. His financial welfare, therefore, is enhanced by positive action and is not enhanced by negative action. The situation, again, is one which offers "a possible temptation to the average man as a judge . . . or which might lead him not to hold the balance nice, clear and true between the State and the accused." It is, in other words, another situation where the defendant is subjected to what surely is judicial action by an officer of a court who has "a direct, personal, substantial, pecuniary interest" in his conclusion to issue or to deny the warrant.
> [*Id.* at 250, 97 *S.Ct.* at 548, 50 *L.Ed.*2d at 448.]

In *Marshall,* however, the Court concluded that the animating principle of *Tumey, Ward* and *Connally* was not applicable to the determinations of the Assistant Regional Administrator of the Department of Labor's Employment Standards Administration (ESA) in assessing civil penalties against Jerrico, Inc. (Jerrico) for the unlawful employment of child labor, notwithstanding that the penalties collected were paid over to the agency to reimburse the costs of determining violations and assessing penalties. After Jerrico had filed exceptions to the penalty assessment, a hearing was held pursuant to statute before an administrative law judge, who

> accepted the . . . contention that violations had occurred, concluding that the record showed "a course of violations" for which "[r]espondent's responsibility cannot be disputed." At the same time, he was persuaded by appellee's witnesses and by a review of the evidence that the violations were not willful. Accordingly, he reduced the total assessment to $18,500.
>
> [*Marshall, supra,* 446 *U.S.* at 240–41, 100 *S.Ct.* at 1612, 64 *L.Ed.*2d at 187.]

Jerrico then sued in the United States District Court, raising constitutional issues. That court granted Jerrico's motion for

summary judgment. Acknowledging that the federal Office of Administrative Law Judges was itself, "unaffected by the total amount of the civil penalties," *ibid.*, the District Court

concluded that the reimbursement provision created an impermissible risk of bias on the part of the assistant regional administrator. Citing *Tumey v. Ohio,* 273 *U.S.* 510, 47 *S.Ct.* 437, 71 *L.Ed.* 749 (1927), and *Ward v. Village of Monroeville,* 409 *U.S.* 57, 93 *S.Ct.* 80, 34 *L.Ed.*2d 267 (1972), the court found that because a regional office's greater effort in uncovering violations could lead to an increased amount of penalties and a greater share of reimbursements for that office, § 16(e) could distort the assistant regional administrator's objectivity in assessing penalties for violations of the child labor provisions of the Act.

[*Id.* at 241–42, 100 *S.Ct.* at 1612–13, 64 *L.Ed.*2d at 187–88.]

The United States Supreme Court reversed. The Court observed:

The Due Process Clause entitles a person to an impartial and disinterested tribunal in both civil and criminal cases. This requirement of neutrality in adjudicative proceedings safeguards the two central concerns of procedural due process, the prevention of unjustified or mistaken deprivations and the promotion of participation and dialogue by affected individuals in the decisionmaking process. *See Carey v. Piphus,* 435 *U.S.* 247, 259–262, 266–267, 98 *S.Ct.* 1042, 55 *L.Ed.*2d 252 (1978). The neutrality requirement helps to guarantee that life, liberty, or property will not be taken on the basis of an erroneous or distorted conception of the facts or the law. *See Mathews v. Eldridge,* 424 *U.S.* 319, 344, 96 *S. Ct.* 893, 907, 47 *L.Ed.*2d 18 (1976). At the same time, it preserves both the appearance and reality of fairness, "generating the feeling, so important to a popular government, that justice has been done," *Joint Anti-Fascist Committee v. McGrath,* 341 *U.S.* 123, 172, 71 *S.Ct.* 624, 649, 95 *L.Ed.* 817 (1951) (Frankfurter, J., concurring), by ensuring that no person will be deprived of his interests in the absence of a proceeding in which he may present his case with assurance that the arbiter is not predisposed to find against him.

[*Id.* at 242, 100 *S.Ct.* at 1613, 64 *L.Ed.*2d at 188.]

Noting the general principles of *Tumey, Ward, Connally* and related cases, the Court went on to conclude:

[T]he strict requirements of *Tumey* and *Ward* are not applicable to the determinations of the assistant regional administrator, whose functions resemble those of a prosecutor more closely than those of a judge. The biasing influence that appellee discerns in § 16(e) is, we believe, too remote and insubstantial to violate the constitutional constraints applicable to the decisions of an administrator performing prosecutorial functions.

[*Id.* at 243–44, 100 *S.Ct.* at 1614, 64 *L.Ed.*2d at 189.]

The District Court in *Marshall* had engaged in the type of analysis performed by the trial judge in this case, and had

concluded that, by reason of the fiscal impact of the penalties assessed,

the challenged provision violated the Due Process Clause under the principles set forth in *Tumey* and *Ward*. It noted that, as the 1977 practice demonstrated, the ESA has discretion to return sums collected as civil penalties to the regional offices in proportion to the amounts expended on enforcement efforts. Increased enforcement costs could thus lead to a larger share of reimbursements. According to the court, an assistant regional administrator would therefore be inclined to maximize the total expenditures on enforcement of the child labor provisions of the Act, and those increased expenditures would result in an increase in the number and amount of penalties assessed. The court concluded that this possibility created an unconstitutional risk of bias in the assistant regional administrator's enforcement decisions.

[*Id.* at 246–47, 100 *S.Ct.* at 1615, 64 *L.Ed.*2d at 191.]

In rejecting this approach, the Supreme Court stated:

The assistant regional administrator simply cannot be equated with the kind of decisionmakers to which the principles of *Tumey* and *Ward* have been held applicable. He is not a judge. He performs no judicial or quasi-judicial functions. He hears no witnesses and rules on no disputed factual or legal questions. The function of assessing a violation is akin to that of a prosecutor or civil plaintiff. If the employer excepts to a penalty—as he has a statutory right to do—he is entitled to a de novo hearing before an administrative law judge. In that hearing the assistant regional administrator acts as the complaining party and bears the burden of proof on contested issues. 29 *CFR* § 580.21(a) (1979). * * * It is the administrative law judge, not the assistant regional administrator, who performs the function of adjudicating child labor violations. As the District Court found, the reimbursement provision of § 16(e) is inapplicable to the Office of Administrative Law Judges.

The rigid requirements of *Tumey* and *Ward,* designed for officials performing judicial or quasi-judicial functions, are not applicable to those acting in a prosecutorial or plaintiff-like capacity. Our legal system has traditionally accorded wide discretion to criminal prosecutors in the enforcement process, *see Linda R.S. v. Richard D.,* 410 *U.S.* 614, 93 *S.Ct.* 1146, 35 *L. Ed.*2d 536 (1973), and similar considerations have been found applicable to administrative prosecutors as well, see *Moog Industries, Inc. v. FTC,* 355 *U.S.* 411, 414, 78 *S.Ct.* 377, 380, 2 *L. Ed.*2d 370 (1958); *Vaca v. Sipes,* 386 *U.S.* 171, 182, 87 *S.Ct.* 903, 912, 17 *L. Ed.*2d 842 (1967). Prosecutors need not be entirely "neutral and detached," *cf. Ward v. Village of Monroeville,* 409 *U.S.* at 62, 93 *S.Ct.* at 84, 34 *L.Ed.*2d at 272. In an adversary system, they are necessarily permitted to be zealous in their enforcement of the law. The constitutional interests in accurate finding of facts and application of law, and in preserving a fair and open process for decision, are not to the same degree implicated if it is the prosecutor, and not the judge, who is offered an incentive for securing civil penalties. The distinction between judicial and nonjudicial officers was explicitly made in *Tumey,* 273 *U.S.* at 535, 47 *S.Ct.* at 445, 71 *L.Ed.* at 749, where the Court noted that a state legislature "may, and often ought to, stimulate

prosecutions for crime by offering to those who shall initiate and carry on such prosecutions rewards for thus acting in the interest of the state and the people." [*Id.* at 247–49, 100 *S.Ct.* at 1615–16, 64 *L. Ed.*2d at 191–92.]

The Court went on, however, to reject the idea "that the Due Process Clause imposes no limits on the partisanship of administrative prosecutors." *Id.* at 249, 100 *S.Ct.* at 1616, 64 *L.Ed.*2d at 192.

Prosecutors are also public officials; they too must serve the public interest. *Berger v. United States*, 295 *U.S.* 78, 88, 55 *S.Ct.* 629, 633, 79 *L.Ed.* 1314 (1935). In appropriate circumstances the Court has made clear that traditions of prosecutorial discretion do not immunize from judicial scrutiny cases in which the enforcement decisions of an administrator were motivated by improper factors or were contrary to law. * * * Moreover, the decision to enforce—or not to enforce—may itself result in significant burdens on a defendant or a statutory beneficiary, even if he is ultimately vindicated in an adjudication. * * * A scheme injecting a personal interest, financial or otherwise, into the enforcement process may bring irrelevant or impermissible factors into the prosecutorial decision and in some contexts raise serious constitutional questions. * * * But the strict requirements of neutrality cannot be the same for administrative prosecutors as for judges, whose duty it is to make the final decision and whose impartiality serves as the ultimate guarantee of a fair and meaningful proceeding in our constitutional regime.
[*Id.* at 249–50, 100 *S.Ct.* at 1616–17, 64 *L.Ed.*2d at 192–93 (citations omitted).]

It is clear, nevertheless, that, with a focus on the fairness-assuring insulation of an independent adjudicating officer, *i.e.,* the administrative law judge with final-decision-making authority, *see id.* at 248 n. 9, 100 *S.Ct.* at 1616 n. 9, 64 *L.Ed.*2d at 191 n. 9, the Supreme Court discerned no basis in the circumstances presented in *Marshall* to warrant a declaration of unconstitutionality. *See id.* at 250, 100 *S.Ct.* at 1617, 64 *L.Ed.*2d at 193 ("we need not say with precision what limits there may be on a financial or personal interest of one who performs a prosecutorial function, for here the influence alleged to impose bias is exceptionally remote"); *cf. United States ex rel. Kelly v. Boeing Co.*, 9 *F.*3d 743, 759–60 (9th Cir.1993), *cert. denied,* 510 *U.S.* 1140, 114 *S.Ct.* 1125, 127 *L. Ed.*2d 433 (1994).

And, in a further analysis, the Court saw no prudential reasons, either, for invalidating the statutory scheme. In *Marshall*, "the civil penalties collected ... represent[ed] substantially less than 1% of the budget" of the agency involved. *Id.* at 250, 100 *S.Ct.* at

1617, 64 *L.Ed.*2d at 193. Here, as noted by the trial judge, "actual experience in the years 1998, 1999 and 2000 has constituted an average[,] after distribution to other agencies[,] of 1.97% of [county prosecutors'] total budgets for 1998, 2.32% for 1999, and 2.07% for 2000[.]" These are overall, statewide percentages. In certain counties, in any given year the percentages were lower or higher, ranging from 0.20% to 7.17%.

Here, as in *Marshall,* "[n]o governmental official stands to profit economically from vigorous enforcement[.]" *Ibid.* "The pressures relied on in cases such as *Tumey* [], *Gibson v. Berryhill,* 411 *U.S.* 564, 579, 93 *S.Ct.* 1689, 1698, 36 *L.Ed.*2d 488, 500 (1973); and *Connally* [], are entirely absent here." *Marshall, supra,* 446 *U.S.* at 250, 100 *S.Ct.* at 1617, 64 *L.Ed.*2d at 193.

> The District Court's conclusion that the reimbursement provision violated the Due Process Clause was evidently premised on its perception that an assistant regional administrator might be tempted to devote an unusually large quantity of resources to enforcement efforts in the hope that he would ultimately obtain a higher total allocation of federal funds to his office. This increase in enforcement effort, the court suggested, might incline the assistant regional administrator to assess an unjustified number of penalties, and to make those penalties unduly high. But in light of the factors discussed above, it is clear that this possibility is too remote to violate the constraints applicable to the financial or personal interest of officials charged with prosecutorial or plaintiff-like functions. * * * We are thus unable to accept appellee's contention that, on this record and as presently administered, the ... provision [at issue] violates standards of procedural fairness embodied in the Due Process Clause.
>
> [*Id.* at 251–52, 100 *S.Ct.* at 1618, 64 *L.Ed.*2d at 194.]

For like reasons, we arrive at the same conclusion in respect of New Jersey's criminal instrumentality forfeiture process. There are more similarities than differences between the situation in *Marshall* and the one presented here. As with the administrative prosecutors in *Marshall,* the county prosecutors here derive no personal benefit from the forfeiture process. Moreover, county prosecutors and the Attorney General cannot set budgets by anticipating forfeiture proceeds, or spend that money on regular salaries. The proceeds must be devoted to special law enforcement purposes within defined, narrowly established parameters. Although the budget percentages represented by the forfeiture

totals found here are somewhat higher than those established in *Marshall*, they are, in the overall, not so high as to suggest improper motives necessarily. And, the prohibitions against using forfeiture proceeds to fund regular salaries or normal operating needs, contained in the standards promulgated by the Attorney General and administered by that officer, provide adequate generalized safeguards against use of the forfeiture process as a budget-increasing mechanism or any global incentive to proceed arbitrarily, capriciously, or unreasonably. Specific allegations of overreaching or otherwise impermissible conduct or motives can be addressed by the court adjudicating a particular forfeiture application.

In the statutory and administrative scheme provided here, as in *Marshall*, the official seeking forfeiture is, apart from his or her public status, no different from any other plaintiff seeking an economic recovery. The plaintiff presents the claim and the proofs in support thereof to a detached and independent adjudicator—here, a court, *i.e.*, a judge and, when requested in matters where the property is not *prima facie* contraband, a jury, *see State of New Jersey v. One 1990 Honda Accord*, 154 *N.J.* 373, 712 *A.*2d 1148, *motion for clarification denied*, 156 *N.J.* 378, 718 *A.*2d 1207 (1998). The adjudicator receives those proofs and any countervailing evidence and defenses the adversary may proffer. The evidence from both sides is evaluated in the light of statutory standards, and a fair and impartial assessment is made. Notwithstanding that public officers are governed by higher standards of fairness and probity than typically apply to private parties, *see generally, e.g., Barrett v. Union Twp. Comm.*, 230 *N.J.Super.* 195, 200, 553 *A.*2d 62 (App.Div.1989), the election to seek forfeiture under the statute has no qualities of finality, *i.e.*, the official making the choice is not "decid[ing] public issues," *ibid.*; rather, that person is only exercising a choice to proceed in placing the questions before a judicial tribunal.

A financial interest that would disqualify a judge, under cases such as *Tumey v. Ohio*, 273 *U.S.* 510, 47 *S.Ct.* 437, 71 *L.Ed.* 749 (1927), and *Ward v. Village of Monroeville*, 409 *U.S.* 57, 93 *S.Ct.* 80, 34 *L.Ed.*2d 267 (1972), may be "too remote

and insubstantial to violate the constitutional constraints applicable to the decisions of [one] performing prosecutorial functions." *Marshall v. Jerrico, Inc.,* 446 *U.S.* 238, 243–44, 100 *S.Ct.* 1610, 1614, 64 *L.Ed.*2d 182 (1980). Prosecutors, in an adversary system, "are necessarily permitted to be zealous in their enforcement of the law." *Id.* at 248, 100 *S.Ct.* at 1616. Prosecutors are supposed to be advocates; judges are not. Thus it is not without significance, in our view, that in the landmark case of *Tumey v. Ohio, supra,* where the mayor of the Village of North College Hill, Ohio, received significant sums from fines assessed in cases tried in the "mayor's court" over which he presided, it was the financial interest of the mayor, sitting as a judge, that led the Supreme Court to hold that convictions obtained in the mayor's court were constitutionally infirm; although the prosecutor received more than twice as much as the mayor out of the fines assessed, the prosecutor's financial interest evoked no critical comment from the Supreme Court.

[*Dick v. Scroggy,* 882 *F.*2d 192, 197 (6th Cir.1989).]

We discern no special features of the due process of law concepts embodied in the New Jersey Constitution to lead us to a different conclusion than we have reached in applying federal due process standards. Nor has counterclaimant framed an argument impelling a conclusion that her challenge has been sufficient to overcome the presumption that public officials, when following statutorily established procedures, are proceeding in good faith and in a proper exercise of the power and discretion reposed in them. *See Miller v. Passaic Valley Water Comm'n,* 259 *N.J.Super.* 1, 14, 611 *A.*2d 128 (App.Div.), *certif. denied,* 130 *N.J.* 601, 617 *A.*2d 1222 (1992).

Reversed; remanded to the trial court for entry of an order granting the State's motion for summary judgment and dismissing the counterclaim.